[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
Jesus L. was not yet 18 months old on November 9, 1989 when this petition was filed by which his legal guardian, the Department of Children and Youth Services (DCYS), seeks to terminate the parental rights of Isabel R., his mother (and, lacking an acknowledged or adjudicated father, his sole legal guardian), alleging three of the four nonconsensual grounds for such termination set forth in subsection (b) of Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1989) applicable to children, like Jesus L., previously committed to DCYS as neglected or uncared-for.
Isabel attended the initial hearing on December 6, 1989 at which, with the advice of counsel, she agreed to the extension of the child's original commitment beyond its expiration date of February 10, 1990, without prejudice either to her residual CT Page 879 parental rights or to the petitioner's right to proceed with the pending termination action. At this, and all subsequent hearings in this matter, the respondent was represented by counsel and present on writs of habeas corpus from Niantic prison where she had been incarcerated since October of 1989 with an estimated release date of between February and August of 1991.
Following receipt of a psychological evaluation ordered on motion of DCYS, the matter was scheduled for trial which concluded on March 28, 1990. On the first trial date, February 28, 1990, a motion by DCYS to add a fourth ground for terminating the mother's parental rights — denial of necessary care by parental omission or commission by reason of the mother's prenatal substance abuse — was denied for two reasons:
(1) untimely filed on the first day of scheduled trial, and
(2) the underlying facts had existed at the time of commitment when the only relief sought by the state was a transfer of guardianship to DCYS, revocable to the mother. These same facts could not again be used in an action seeking to terminate her parental rights more than a year thereafter.
All parties rested on March 28, 1990 and were given until May 9, 1990 for the filing of trial memoranda and responses thereto. The adjudicatory date is therefore November 9, 1989; the dispositional date March 28, 1990; and the period of reserved decision commenced on May 9, 1990.
Facts
Evidence offered at trial interpreted in the light of the prior record in this court concerning this child, of which judicial notice is taken, supports the finding of the following facts:
Jesus L. was born on February 16, 1988, the fifth child born out of wedlock (State's Exhibit A, p. 2) to his then 25-year old mother. She had then been using drugs for more than two years, including during her pregnancy. Having been arrested and incarcerated on a number of occasions, she was out on bond at the time of his birth. Her use of both cocaine and heroin during pregnancy was the most likely explanation for his premature birth, low birth weight, positive testing for cocaine in his urine, as well as visible withdrawal symptoms. As a result of this condition, he was kept in the hospital following his mother's discharge. Isabel stopped visiting him on February 25, 1988. Four days later, when Jesus was ready for discharge, his mother could not be located. The DCYS social worker learned through a relative that Isabel was to appear in criminal court and found her there. Since CT Page 880 she was not then facing incarceration, DCYS — notwithstanding her prenatal drug use and the resulting negative consequences to the child — did nothing to prevent the child's discharge to his mother who was then living with a Gilberto L. whom she named as the child's father. (Both Isabel and Gilberto disavowed his paternity, in court and under oath, when the child was committed on August 10, 1988.)
DCYS lost contact with mother and child for the next month. On March 28, 1988, 27 days after assuming care of her son, Isabel called DCYS to state that the baby had been placed with a friend for the past few days, and, as she was about to be incarcerated for selling drugs, she requested foster placement. (Testimony of social worker Diaz, February 28, 1990). On March 29, 1988, at the age of six weeks, Jesus L. was placed in the B.Y. foster home where he remains to the present time. On June 10, 1988 his mother was sentenced to four years, suspended after two, and on August 10, 1988 she admitted her son was homeless and agreed to his commitment to DCYS under Sec. 46b-129. At the same time, she agreed to the expectations of the court as general conditions for an eventual reunification with her son. These included visiting and phoning as often as permitted; engaging in drug treatment while in Niantic and after her release; securing adequate housing and income; refraining from drug abuse and further involvement in the criminal justice system. She was given the address and phone number of B.Y. and invited to make her own arrangements directly with B.Y. to visit and telephone as often as possible. For the first few weeks of her incarceration she made six or seven telephone calls, but after securing employment at the prison she stopped calling. Jesus was taken to Niantic to visit his mother approximately monthly between April and November of 1988. On visits occurring after July of 1988, he was transported by "Victor" whom Isabel then referred to as the child's father. (Testimony of B.Y., February 28, 1990).
In November of 1988 Isabel was released to a drug treatment program at the Salvation Army in Hartford. She was returned to Niantic two weeks later for violating rules of the program. In February of 1989 she was given a second opportunity to enter that program but escaped after one week and remained an escapee for the next eight months. On his first birthday, February 16, 1989, "Victor" took Jesus to his maternal grandmother's home where Isabel was then staying. That was the last time she saw her son before the initiation of this action nine months later. In her testimony of March 28, 1990, Isabel explained that she had not visited her son during this period because she had returned to using drugs — injecting heroin intravenously four or five times daily with occasional use of cocaine — and did not want to visit him in that condition. In addition, because she was "on escape", she feared she would CT Page 881 be turned in if she had appeared to visit at the foster home. Asked why she did not write or send cards or gifts, she claimed she did not know the address. Reminded that "Victor" had transported her son on visits and knew the address, she could give no reason why she had not obtained it from him.
By the time Isabel returned to Niantic in October of 1989, she was abusing alcohol, cocaine and heroin, resorting to drug selling and prostitution to support her habit. (Testimony of respondent mother March 28, 1990; State's Exhibit A, p. 3). since reincarceration she has become active in a weekly "survivors' group" concerned with general problems of incarceration, but has not entered either alcohol or drug treatment programs at the prison. When asked the reason for this failure, despite her acquiescence in the court's expectation that she do so, she responded that both AA and NA meetings conflicted with her work at the prison, and she did not "get much out of" such programs.
It was not until two months after her return to prison — one month after the institution of this action — that Isabel requested resumption of prison visits with Jesus. Because she had not visited or telephoned for eight months, and since this petition was then pending, DCYS did not immediately consent to such a visit. However, after the parent-child confrontation on January 8, 1990 in the course of the court-ordered psychological evaluation, a visit to Niantic was arranged for March 14, 1990.
At the time of testifying, Isabel had an estimated release date of August, 1991, her original sentence having been extended because of her escape, with the possibility of an earlier date for home release. She admitted that she would not want her son returned until after she had gotten on her feet with a job and an apartment. (She did not add drug treatment until specifically asked on cross-examination). She acknowledged that "I really don't know how long it would take." Despite the fact that all of her older children were in the care of relatives (Petitioner's Exhibit A, p. 2) and that she had requested placement for Jesus after caring for him for less than one month, she testified that she felt she was a good mother both before and after his birth . . . except for drug use: "If I felt I'm not a good mother, I would not try" to get him back. Her plan upon her release was to start by living with her own mother who had herself been convicted for drug offenses in the past.
In his evaluation (Petitioner's Exhibit A) Dr. Mantell found the child to be ". . . stable with areas of impairment and developmental delay that appear to be connected to damage in the utero secondary to substance abuse by the mother." (Id., p. 5). He found no relationship existing between the CT Page 882 child and either the mother or maternal grandmother, concluding that the present foster mother was the child's psychological parent. He found it likely that substance abuse would be a problem for Isabel after her release from prison. He recommended that the child not be considered for return to his mother unless she had remained out of prison and free of substance abuse for at least one year. This would be February 1992 at the earliest, when Jesus would be four years old having spent a total of 27 days in his mother's care. The prognosis for the mother remaining free of substance abuse for the requisite period was seen as poor considering her history of many prior failed attempts at drug treatment over the now four years of her addiction. Dr. Mantell concluded it would be detrimental for Jesus to wait longer than his three-year lifetime that he has already waited for a permanent home, particularly considering the improbability of a favorable outcome.
Adjudication — On facts as of November 9, 1989
The petitioner has sustained by the requisite clear and convincing standard of proof all three of the grounds originally pleaded for terminating Isabel's parental rights in Jesus L.
(1) While Isabel gave her own reasons for failing to see her son for nine of the 15 months that he was committed to DCYS before the filing of this petition, this is not a defense to the fact that, from the child's point of view, she had failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." An absent parent always has his or her reasons for failing to display interest, concern or responsibility for a child. Grounds for termination, however, exist from an objective point of view. During the first few months of the commitment, the child was brought for monthly visits to Niantic, but the moment Isabel was released from Niantic, her own behavior placed barriers between her and the child. She returned to drug use. She failed to engage in treatment. She was discharged from a community-based drug program after two weeks, and when given a second opportunity she escaped. She did not maintain contact with her son by mail or phone, and failed to do the one thing that would have guaranteed resumption of at least a visiting relationship with the child: Turning herself into the authorities. This was but the latest manifestation of an abandonment that had existed in different forms since the child's birth: the left this fragile, drug-compromised infant for four days in the hospital before his discharge on March 1, 1988 without visiting him or letting the hospital know of her whereabouts. During the 27 days the child was in her care, he had been placed with friends for three or four days. Upon her return to Niantic in October of 1989 she did CT Page 883 not immediately contact DCYS to ask for the resumption of visit. She did not call the foster home or send the child a Christmas card when her request of December 6, 1989 for a visit was initially denied. Apart from caring for Jesus for 27 days in 1988 and requesting prison visits for the first seven months after the child's placement, Isabel has not maintained any reasonable degree of interest or concern or responsibility as to the welfare of that child. It is therefore found that abandonment exists as a ground for terminating her parental rights.
(2) When Jesus was committed on August 10, 1988, his mother had a two-year history of drug abuse, arrests, incarcerations and failed attempts at treatment. Fifteen months later she was again incarcerated, for an extended period, with now a four-year history of drug abuse, arrests, incarcerations and failed attempts at drug treatment. None of the court's expectations, with which she had agreed at the time of commitment with the assistance of counsel, have been met: She did not maintain contact with DCYS from the time of her escape from the second drug treatment program in February of 1989 until her request for a prison visit 10 months later. She did not visit or telephone as often as she would have been permitted. She did not participate in drug and alcohol counselling either in or after Niantic. She at no time has secured a lawful or adequate source of income or procured housing of her own. She has continued substance abuse and had still further involvement with the criminal justice system. Apart from her verbalization of intent, she has not moved an iota closer to being able to care for this developmentally delayed, hyperactive child than she did when she placed him at the age of one month, or when she agreed to his commitment at the age of six months. This constitutes clear and convincing proof that as the parent of a child "who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding," she has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child."
(3) The only clinical testimony in this case establishes that no relationship whatever, much less a parent-child relationship as defined in Sec. 17-43a(b)(4), exists between Jesus and his mother. Such relationship was found to exist between the child and his foster mother, B.Y., whose daughter, if B.Y. is unable to adopt, is well-known to Jesus and would be available as a permanent parent. Isabel herself admitted this (Petitioner's Exhibit A, p. 3) and it is not surprising considering that the child had not seen his mother for nearly a year . . . at the age of two. That fact alone, however, is not grounds to CT Page 884 terminate a parent's rights. The court must also find that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." For this finding the court must evaluate the likelihood that the parent will be capable of providing adequate child care at some point in the future, and then whether or not it would be detrimental to the child to wait until that point. Taking all variable most favorable to Isabel — that she will be eligible for home release in February of 1991 and that she will be able to remain out of jail and free of substance abuse for one year thereafter — it would still be detrimental to Jesus to wait until he is four years old to begin the process of reunification while at the same time having to separate from his psychological parent and her family. According to Dr. Mantell, it would be extremely detrimental for him to wait that long to start the road to permanency. But in fact, this record does not permit inferences that are favorable to Isabel: The nature, duration and severity of her drug abuse history combined with her history of repeated failed attempts at treatment results in "poor prognostic indicators," according to the psychologist. He concluded that, given this recent history, the prognosis is poor, and a return of the child before Isabel had demonstrated her rehabilitation for a full year could have a "devastating" and lasting effect on the child. In testifying in her own behalf, Isabel gave no reason to believe that the future would hold anything different than the recent past: She said AA and NA had not been helpful. She did not name drug treatment as one of the tasks she had set for herself before regaining her son's custody. She had no plan for herself upon release from prison other than to return to live with her mother who, herself, had a drug history. "The likelihood is that substance abuse again will be a problem for her after her release from prison." (Petitioner's Exhibit A, p. 6). While the initial plan at time of commitment was to reunite Jesus with his mother, the events of the ensuing 15 months now make it imperative to ". . . terminate parental rights as expeditiously as possible to free . . . [Jesus] for placement and adoption into [a] stable family setting[s]." In Re Juvenile Appeal, 84-AB,192 Conn. 254, 258 (1984).
Disposition — on facts as of March 28, 1990
Four months after the adjudicatory date, Isabel's situation has not altered. She still is unsure whether she will be released prior to her original release date of August of 1991. She still is in no drug treatment program at the prison. She has had one additional visit that went without incident — but only after Jesus was assured that his foster mother would not abandon him. Her plan upon release is still to return to her CT Page 885 mother with whom she lived during her latest, protracted period of drug abuse, drug selling and prostitution.
Before termination may be ordered, however, the court must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) DCYS offered visitation when the mother was incarcerated and permitted her to make her own arrangements directly with the foster mother for both visits and telephone calls. She was well-aware of drug treatment facilities, having assayed a number of them unsuccessfully in the past. Delaying a prison visit requested after initiation of this action was not unreasonable under all of these circumstances.
(2) While no orders were issued, other than for court appearances and evaluation dates with which the fully complied, the court spelled out specific expectations for the mother to fulfill as preconditions for reunification. These were worked out and agreed to by Isabel and her attorney at the time of commitment. They have been wholly unfulfilled.
(3) Dr. Mantell was unequivocal in finding that the child had no feeling or emotional tie with his biological mother and was clearly bonded to the foster mother he has had for his entire lifetime.
(4) Jesus, at two, is a developmentally delayed, active child who has spent his short life in the B.Y. foster home. It is likely that his future educational and emotional development may be compromised by his mother's prenatal drug use. He needs an extraordinary degree of secure nurture and the assurance of permanency now, before he leaves the confines of home and enters the wider world of school.
(5) Isabel has made no effort to adjust her circumstances, conduct or conditions to make it in the best interests of this child to return to her home in the foreseeable future. The one class she attends at the prison does not relate to drug abuse or parenting. She requested resumption of visits to Niantic, but not until two months after being reincarcerated and two weeks after being served with the petition in this action. She had the B.Y. address and telephone number, but for nearly a year used neither to inquire as to the welfare of her son. During this time, the child's legal guardian had no way to contact her since she was "on escape" and so could not: CT Page 886 have been informed of any emergency had one arisen during this period.
(6) Isabel was prevented from maintaining a meaningful relationship with Jesus, but not by any act — reasonable or unreasonable — of any other person but purely by her own conduct in returning to drug abuse and crime.
Having considered the foregoing, and the fact that either B.Y. or her daughter are available to adopt Jesus — and if neither of them is available and parental rights are terminated he will be able to begin integrating into an adoptive home at once, without waiting until February of 1992 — it is found by clear and convincing evidence to be in the best interests of Jesus L. for his mother's parental rights to be terminated so that he may be placed in the security of permanent adoption without further delay.
It is therefore ORDERED that the parental rights of Isabel R. in and to her child Jesus L. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption, and to secure that end is further ORDERED to submit to this court no later than 90 days from the date of this judgment a written report as to the progress toward such adoption, and thereafter at such intervals and in such forms as this court may from time to time require. If the adoption of the child is not finalized by December 1, 1991, DCYS is further ORDERED to submit a Motion for Review of Terminated Child to ensure judicial review before 18 months has passed following the date of this judgment.
Appeal
Isabel has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith CT Page 887 that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Plainville this 24th day of August 1990
BRENNEMAN, JUDGE